**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| DAVID AYALA**,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| WILLIAM FOSTER, ERNEST HERNANDEZ, | ) |
| JAMES SCHMIDT, B. MILLER, E. LABIAK, | ) |
| STEPHEN CASTO, THOMAS RICHARDSON, | ) |
| THOMAS PTAK, MICHAEL DUFFIN, | ) |
| RICHARD SOLITA, REYNALDO GUEVARA, | ) |
| R. JOHNSON, DENNIS MADERAK, W. | ) |
| ANDERSON, IVORY HAMPTON, ANTHONY | ) |
| PECORARO, ANTHONY KUTA, ROMAN | ) |
| TAPKOWSKI, R. KUROWSKI, S. BYCZEK, | ) |
| VINCENT TONDRYK, KENNETH MANN, | ) |
| P. WILINDEZ, STRAZA, MICHAEL MCMEEL, | ) |
| EVANS, NORBERT FERET, EARL ZUELKE, | ) |
| E. PICKETTE, PHILLIP SZPICKI, N. DUB, | ) |
| JOHN REGAN, UNIDENTIFIED POLICE | ) |
| OFFICER; the CITY OF CHICAGO, GREGG | ) |
| OWEN, TIMOTHY MCMAHON, JACK | ) |
| SMEETON, and COOK COUNTY, | ) |
| | ) |
| | ) No. |
| | ) |
| | ) **JURY TRIAL DEMANDED** |
| Defendants. | ) |

## <u>COMPLAINT</u>

Plaintiff, DAVID AYALA, by his undersigned attorney, for his complaint against

WILLIAM C. FOSTER, STAR #3188, ERNEST M. HERNANDEZ, STAR #5388, JAMES H.

SCHMIDT, STAR #895, B. MILLER, STAR #7854, E. LABIAK, STAR #2350, STEPHEN J.

CASTO #15489, THOMAS J. RICHARDSON, STAR #3385, THOMAS PTAK, MICHAEL F.

DUFFIN, RICHARD J. SOLITA, REYNALDO GUEVARA, R. JOHNSON, STAR #15536,

DENNIS S. MADERAK, STAR #3251, W. ANDERSON, STAR #13003, IVORY L. HAMPTON, STAR #7021, ANTHONY J. PECORARO, STAR #2683, ANTHONY W. KUTA, STAR #4527, ROMAN S. TAPKOWSKI, STAR #15665, R. KUROWSKI, STAR #755, S. BYCZEK, STAR #9539, VINCENT J. TONDRYK, STAR #3492, KENNETH E. MANN, STAR #6725, P. WILINDEZ, STAR #8140, STRAZA, STAR 11807, MICHAEL L. MCMEEL, STAR #2198, EVANS, STAR #12864, NORBERT W. FERET, STAR #8550, EARL W. ZUELKE, STAR #4053, E. PICKETTE, STAR #12386, PHILLIP SZPICKI, STAR #4014, N. DUB, STAR #5243, SGT JOHN T. REGAN, STAR #1864. UNIDENTIFIED CHICAGO POLICE OFFICERS, the CITY OF CHICAGO, COOK COUNTY STATE'S ATTORNEYS GREGG OWEN, TIMOTHY MCMAHON, and JACK SMEETON, COOK COUNTY, ILLINOIS, and as-yet unknown employees of the City of Chicago and Cook County, and states as follows:

## INTRODUCTION

1.      David Ayala, 18 years old, was framed for the 1981 double homicide that occurred in Pietrowski Park ("the Pietrowski murders") in Chicago, Illinois. He was sentenced to life in prison and served 42 years before being exonerated in December 2023.

2.      Unfairly labeled as a gang leader, Ayala served nearly two decades of his sentence in isolation at the now-closed Tamms Supermax Correctional Center that has been aptly described as a "human rights catastrophe."

3.      Mr. Ayala played no role in the Pietrowski murders. No physical evidence connected him to the crime. No witness placed him at the scene. He made no statements suggesting his involvement. His conviction was based entirely on the false and fabricated testimony of one of the true killers, Wally Cruz ("Gator").

4.       Cruz's testimony was procured through threats, coercion, and bribery from the Defendant Officers and Defendant Prosecutors who created the false narrative and knew it was false.

5.       Defendants brazenly arrested, beat, threatened, and falsely charged dozens of suspected gang members all with the purpose of coercing fabricated statements designed to frame Mr. Ayala and his cousin, James Soto, for the Pietrowski murders. The Defendants knew the identity of the true perpetrators of the crime but falsely charged Mr. Ayala and Mr. Soto with no probable cause to believe they had any involvement in the crime.

6.       Defendants fabricated police reports, grand jury testimony, and eventually trial testimony that was used to convict Mr. Ayala.

7.       Defendants also suppressed exculpatory evidence that exonerated Mr. Ayala and pointed to other individuals as the true offenders. Defendants suppressed and concealed their own wrongdoing and the wrongdoing of their co-conspirators.

8.       Mr. Ayala fought tirelessly over the years to prove his innocence. He was obstructed in his quest to prove the truth at every turn, in part because he was imprisoned in severe isolation at Tamms Supermax and then later outside the state of Illinois.

9.       After the Illinois Appellate Court remanded his case for an evidentiary hearing in connection with, *inter alia,* his claims of actual innocence, the Cook County State's Attorney's Office agreed that Mr. Ayala was entitled to post-conviction relief. His conviction and life sentence were vacated on December 14, 2023. The State of Illinois dismissed all charged against him that same day.

10.      Mr. Ayala served 42 years in the department of corrections for crimes that he did not commit, ripped from his family, denied every opportunity that life affords, including raising

his infant daughter.  What's more, he endured nearly two decades of torture while imprisoned at the Tamms Supermax facility – not because he was a danger to staff or inmates – but because of his fabricated gang status.

11.     Mr. Ayala now seeks justice for the inconceivable harm that the Defendants caused him and redress for the incalculable loss of liberty and hardship that he endured and continues to suffer as a result of the Defendants' misconduct.

## JURISDICTION AND VENUE

12.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of state law of Plaintiff's rights as secured by the United States Constitution as well as the deprivation of rights under Illinois state law.

13.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1367. Venue is proper under 28 U.S.C. §1391(b), because the parties reside in this judicial district, and the events giving rise to the claims asserted herein occurred in this judicial district.

## PARTIES

14.     Plaintiff David Ayala is a 61-year-old man who spent 42 years in prison for a crime he did not commit.

15.     At all relevant times hereto, the following named Defendants were members of the Chicago Police Department ("CPD") acting under the color of law and within the scope of their employment: WILLIAM C. FOSTER, STAR #3188, ERNEST M. HERNANDEZ, STAR #5388, JAMES H. SCHMIDT, STAR #895, B. MILLER, STAR #7854, E. LABIAK, STAR #2350, STEPHEN J. CASTO #15489, THOMAS J. RICHARDSON, STAR #3385, THOMAS PTAK, MICHAEL F. DUFFIN, RICHARD J. SOLITA, REYNALDO GUEVARA, R.

JOHNSON, STAR #15536, DENNIS S. MADERAK, STAR #3251, W. ANDERSON, STAR #13003, IVORY L. HAMPTON, STAR #7021, ANTHONY J. PECORARO, STAR #2683, ANTHONY W. KUTA, STAR #4527, ROMAN S. TAPKOWSKI, STAR #15665, R. KUROWSKI, STAR #755, S. BYCZEK, STAR #9539, VINCENT J. TONDRYK, STAR #3492, KENNETH E. MANN, STAR #6725, P. WILINDEZ, STAR #8140, STRAZA, STAR 11807, MICHAEL L. MCMEEL, STAR #2198, EVANS, STAR #12864, NORBERT W. FERET, STAR #8550, EARL W. ZUELKE, STAR #4053, E. PICKETTE, STAR #12386, PHILLIP SZPICKI, STAR #4014, N. DUB, STAR #5243, SGT JOHN T. REGAN, STAR #1864, the CITY OF CHICAGO,

16.     Other unknown law enforcement officers supervised the Police Officer Defendants and participated in the misconduct alleged in this complaint and also facilitated, condoned, approved, and turned a blind eye to the misconduct of the Defendants whom Defendant Regan and other unknown law enforcement officers supervised.

17.     Defendants Foster, Hernandez, Schmidt, Miller, Labiak, Casto, Richardson, Ptak, Duffin, Solita, Guevara, Johnson, Maderak, Anderson, Hampton, Pecoraro, Kuta, Tapkowski, Kurowski, Byczek, Tondryk, Mann, Wilindez, Straza, McMeel, Evans, Feret, Regan, and other as-yet unidentified police officers are referred to collectively as "Defendant Officers."

18.     At all relevant times, Defendant GREGG OWEN was an Assistant State's Attorney with the Gang Crimes Unit of the Cook County State's Attorney's Office ("CCSAO"). He is sued for actions he undertook, in conspiracy with Defendant Officers, as an investigator and without probable cause to believe that Plaintiff had committed any crime. He acted under color of law and within the scope of his employment for the CCSAO.

19.     At all relevant times, Defendant TIMOTHY MCMAHON was an Assistant State's Attorney with the Gang Crimes Unit of the CCSAO. He is sued for actions he undertook, in conspiracy with Defendant Officers, as an investigator and without probable cause to believe that Plaintiff had committed any crime. He acted under color of law and within the scope of his employment for the CCSAO.

20.     At all relevant times, Defendant JACK SMEETON was an Assistant State's Attorney with the Gang Crimes Unit of the CCSAO. He is sued for actions he undertook, in conspiracy with Defendant Officers, as an investigator and without probable cause to believe that Plaintiff had committed any crime. He acted under color of law and within the scope of his employment for the CCSAO.

21.     Defendants Owen, McMahon, and Smeeton are referred to collectively as "Prosecutor Defendants."

22.     Defendant City of Chicago ("the City") is a municipal corporation that is or was the employer of the above-named Defendant Officers. Each of the Defendant Officers acted during their investigation as agents or employees of the City. The City is liable based on *respondeat superior* for the acts of Defendant Officers. The City is additionally responsible for the policies and practices of the CPD.

23.     Defendant Cook County ("the County") is a governmental entity within the State of Illinois, which provides funding for the CCSAO and was at all relevant times the employer of Defendants Owen, McMahon, and Smeeton. The County is a necessary party to this lawsuit and is responsible for paying any judgment entered against Defendants Owen, McMahon, and Smeeton.

24.      Each individual Defendant is sued in his or her individual capacity.

## FACTUAL ALLEGATIONS

### The Pietrowski Park Murders

25.     On August 16, 1981, Julie Limas and Hector Valeriano were standing with a group of young people in Pietrowski Park in Chicago, Illinois. Two men fired a handgun and a rifle from across the street into the group. Limas and Valeriano were killed; a third person, Juan Padilla was wounded. Padilla was a member of the Latin Kings street gang.

26.     Investigators interviewed dozens of witnesses at the park who described a blue van and two shooters who fired from a gangway adjacent to the park, one with a rifle and another with a handgun. No one implicated Mr. Ayala or his criminal co-defendant, James Soto, in the crime.

27.     In the immediate aftermath of the shooting, witnesses identified two perpetrators. They reported that the person shooting a handgun was 16-year-old Victor "Fat Victor" Rodriguez, and that 22-year-old John "J.J." Rojas was driving a blue van, Rojas fled the City of Chicago immediately after the shooting.

28.     The case garnered significant media attention and Defendants faced increasing pressure to close the case when no charges were immediately brought.

29.     On October 5, 1981, Defendants Foster and Hernandez closed the case after obtaining an arrest warrant for Rodriguez. Rodriguez was arrested and charged as a juvenile. However, the Defendants, including the Prosecutor Defendants, decided to drop the case against Rodriguez after a juvenile court judge declined to transfer the case to adult court so that Rodriguez could be prosecuted as an adult.

30.     On or around October 14, 1981, the Defendant Officers (Foster, Hernandez, Schmidt, Miller, Labiak, Casto, Richardson, Ptak, and Duffin) met with high ranking CCSAO

officials including the Defendant Prosecutors to formulate a plan to falsely charge Mr. Ayala and his cousin James Soto with the crimes despite having developed no evidence whatsoever that the men were responsible for the Pietrowski Park murders.

### Mr. Ayala Is Relentlessly Harassed by Chicago Police Officers in the Year Leading up to His Arrest for the Pietrowski Murders

31.     Defendants conspired to target Mr. Ayala and his cousin for the murders, in part to cover up their own criminal conduct to which Mr. Ayala was a witness and a victim. Defendants Foster, Hernandez, and other Chicago police officers operating in the Marquette Park area were heavily involved in a "pay to play" scheme with gang members, including the Two-Six street gang. Rather than police the communities impacted by gang violence, Defendants Foster, Hernandez and other Defendant Officers exploited the community, arresting gang members, and forcing them to buy their way out of trouble with cash, guns, or drugs.

32.     Leading up to his arrest, Mr. Ayala was continually harassed by Defendants Foster and Hernandez and 10th District police officers, in part, because his best friend was dating the Commander of the 10th District of the Chicago police department.

33.     Ayala filed an OPS complaint against Chicago police officers for the continued harassment he suffered. Shortly after filing that OPS complaint, Ayala was pulled over by officers in the area who threatened him with harm and with false criminal charges. Ayala recalls numerous police cars on the scene and the officers had copies of his OPS complaint. They taunted him, threatened him, and promised to exact revenge on him for daring to complain about their misconduct. Ayala was only 17 years old.

34.     In and around December 1980, Ayala was on his way to school when he was kidnapped by Chicago police officers. He was thrown into van, duct taped around his eyes and handcuffed with Chicago police department issued handcuffs. Mr. Ayala was taken to an

unknown location. The kidnappers reached out to Mr. Ayala's father telling him that his son would be released upon the payment of a ransom. Mr. Ayala's parents called the Federal Bureau of Investigation ("FBI") who came to the home to monitor incoming phone calls.

35.     No ransom was paid, and Mr. Ayala was released less than 24 hours later.

36.     FBI agents later told the Mr. Ayala that they believed that the perpetrators were Chicago police officers because they were investigating a rogue group of Chicago police officers in the area who were engaging in extortion schemes and kidnapping plots.

37.     Less than a month after Mr. Ayala's father was murdered.

**Defendants Conspire to Frame Ayala and his Cousin James Soto**

38.     At the time of Mr. Ayala's arrest in connection with the Pietrowski murders, Defendants continued to harass Mr. Ayala, including attempting to frame him for a gun case. Defendants contrived a narrative that Mr. Ayala was a "leader" of the Two-Six street gang and relentlessly stopped and harassed him, often stopping him and threatening to lock him up.

39.     On October 14, 1981, roughly two months after the murders, the Defendant Officers (Foster, Hernandez, Schmidt, Miller, Labiak, Casto, Richardson, Ptak, and Duffin) met with high ranking CCSAO official, including Defendants Owen and Smeeton, to formulate a plan to frame Ayala and his cousin.

40.     Defendants knew that Ayala (and Soto) were not involved in the crime but agreed to fabricate evidence against them so they could create a spectacle around the evils of gang violence and give the (false) impression that they were addressing gang violence in the City. In reality, they were largely responsible for ongoing gang activities and were profiting from it. The frame-up of Ayala had the added benefit of incarcerating a witness who had direct knowledge of their criminal activity and who had previously lodged a formal complaint against them.

41.     Defendant Owen, the gang crimes chief at the CCSAO, and his side-kick Defendant Smeeton met with the Defendant Officers to discuss the plan for framing Ayala. Defendants Owen and Smeeton and the Defendant Officers discussed that they could frame Ayala and Soto by coercing fabricated testimony from Wally Cruz – a Two-Six street gang member – who had been implicated in the shooting. Cruz had fled to Louisiana immediately after the shooting but had returned to Chicago.

42.     The following day, the Defendants Foster and Hernandez picked up Cruz and brought him to the CCSAO gang crimes unit where they met with Defendants Owen and Smeeton. Defendants questioned Cruz about his involvement in the shooting and told him they knew he was involved and that they had air-tight evidence implicating him as one of the shooters.

43.     Cruz initially denied any involvement but eventually admitted his involvement in the shooting. When asked about Mr. Ayala or Mr. Soto's role in the shooting, Cruz truthfully told the Defendants that neither Mr. Ayala nor Mr. Soto had anything to do with the crime.

44.     The Defendant Officers and Defendant Prosecutors insisted that Mr. Ayala, as the leader of the gang, must have "ordered" the shooting. Cruz repeatedly denied that Ayala had ordered any such shooting. The Defendant Officers and Defendant Prosecutors told Cruz that if he did not implicate Mr. Ayala and Mr. Soto in the shooting, he would take the case by himself and go to prison for life, or even face the death penalty. They offered him another option. That is, if he "played ball" by falsely implicating Mr. Ayala and Mr. Soto in the shootings, they would ensure that he was charged with a lesser offense and did minimal time in prison for his role in the double murder and attempted murder.

45.     After a lengthy interrogation, Cruz eventually capitulated to the demands of the Defendants under duress, coercion and his own self-interest. The Defendant Officers and Prosecutor Defendants contrived a false story that Ayala held a "gang meeting" at his house in Westchester, Illinois attended by over a dozen Two-Six street gang members, including individuals who the Defendants knew had never even set foot inside Mr. Ayala's home in Westchester. The Defendants further developed their false story, telling Cruz that he would have to say that Mr. Ayala directed Two-Six gang members to "hit" opposition gang members during the supposed gang meeting and that Mr. Ayala specifically directed James Soto, Ruben Paloma, and Cruz to carry out a shooting in Pietrowski park where Latin Kings would sometimes hang out.

46.     Cruz told the Defendants that he was not even at Ayala's home on the day of the shooting and that none of the gang members he knew were at Ayala's house. The Defendants told Cruz that it did not matter that no gang meeting occurred, no one believe "gang bangers" anyway. Defendants told Cruz to name all the Two-Six gang members he knew and that he should falsely claim that they were at Ayala's home for the gang meeting. Cruz was told he would have to repeat the story before the grand jury and that the prosecutors would lead him through the fabricated story anyway.

47.     Defendants had interviewed dozens of individuals associated with the Two-Six street gang and none of them confirmed that any gang meeting occurred at Mr. Ayala's home or that he had ever directed "hits" on Latin Kings at a meeting on August 16, 1981 – or at any other time.

48.     Cruz agreed to adopt the false and fabricated story and was taken directly before a grand jury where he repeated the false story fed to him by the Defendant Officers and Defendant Prosecutors.

**Defendants Round-Up and Terrorize Dozens of Young People to Frame Ayala**

49.     After coercing Cruz's cooperation, Defendants designed and enacted a plan to arrest and coerce all the young people allegedly associated with the Two Six street gang, including numerous juveniles and even the girlfriends of these alleged gang members.

50.     The Defendant Officers arrested Mr. Ayala and Soto (and a dozen others) without probable cause and based entirely on the story the Defendants fabricated and fed to Cruz.

51.     One of more of Defendants, including Defendant Officers Foster, Hernandez, Schmidt, Miller, Labiak, Casto, Richardson, Ptak, Duffin, Solita, Guevara, Johnson, Maderak, Anderson, Hampton, Pecoraro, Kuta, Tapkowski, Kurowski, Byczek, Tondryk, Mann, Wilindez, Straza, McMeel, Evans, Feret, Zuelke, Pickette, Szpicki, Dub, and Regan, and ASA Defendants Smeeton, McMahon, and Owen, acting as investigators, used threats of harm and criminal charges to coerce over a dozen witnesses to provide false statements that would corroborate the initial fabricated story fed to Cruz by Defendants, knowing full well that they were fabricating false evidence which would result in Mr. Ayala's wrongful prosecution and conviction.

52.     Defendants listed in the above-referenced paragraph arrested and held over a dozen witnesses without access to counsel or family, did not inform them of their rights, physically beat them, deprived them of sleep and food, harassed them, and threatened them for the purpose of coercing testimony against Mr. Ayala.

53.     Even before her arrest on October 16, 1981, one or more of Defendant Officers, including Defendants Foster, Hernandez, Richardson, and Solita, had been harassing and

threatening Isabel Gomez into giving false testimony to inculpate Mr. Ayala. These Defendant Officers even threatened to falsely tell other gang members that she implicated them in murder and the Defendant Officers threatened to arrange for her to be raped by gang members.

54.     The Defendant Officers arrested Ms. Gomez and Lisa Suarez, held them over night. The Defendant Officers and Defendant Prosecutors went so far as to charge Ms. Gomez with murder to force her into adopting the false narrative implicating Mr. Ayala which she eventually did. The murder charge against her was tossed the following day.

55.     When witnesses refused to cooperate, the Defendant Officers and the Prosecutor Defendants made threats to try to intimidate them into cooperating, including threats of false charges.

56.     Defendant Officers and Prosecutor Defendants never disclosed the mistreatment of witnesses during interrogations, and Defendant Officers withheld all police reports documenting these interrogations and the coercive and improper tactics used during these interrogations. They also suppressed the exculpatory evidence they received during these interviews.

57.     These witnesses later provided affidavits swearing that the Defendants were attempting to force them to falsely corroborate Cruz's coerced and fabricated claim of a gang meeting at Mr. Ayala's home on August 16, 1981. A meeting that never occurred and which was manufactured from whole cloth by the Defendants.

58.     Defendant Officers, including Defendants Foster and Hernandez, wrote false narratives of what transpired during these interrogations in police reports and suppressed the abusive and coercive tactics Defendants used to intimidate witnesses into giving false testimony that inculpated Mr. Ayala.

59.     Based on the evidence fabricated by the Defendants, Mr. Ayala was charged with the double murder and attempted murder.

60.     No probable cause existed to support the charges. Indeed, the whole premise of a "gang meeting" during which Mr. Ayala allegedly directed the murders was a bald-faced lie contrived entirely by the Defendants.

**Coerced and Incentivized Trial Testimony**

61.     In September 1982, Mr. Ayala, Mr. Soto, and Ruben Palomo went to trial for the Pietrowski murders.

62.     Wally Cruz, the State's star witness, gave the only trial testimony falsely implicating Mr. Ayala and Mr. Soto. The same false testimony fabricated by the Defendants.

63.     Not one of the individuals that Cruz claimed was at David Ayala's house the night of the crime corroborated his fabricated testimony.

64.     The State presented false and coerced testimony from Isabel Gomez who claimed that her friend Lisa Suarez called Mr. Ayala from a restaurant near the park. Ms. Gomez testified that she did not hear the conversation, but the State nonetheless introduced false and fabricated (hearsay) evidence through Gomez that Suarez called Mr. Ayala from a restaurant near Pietrowski Park after the shooting. The testimony was false and fabricated and designed to corroborate the theory that Mr. Ayala had some knowledge or involvement in the shootings. Ms. Suarez never called Mr. Ayala.

65.     The Defendants did not disclose that Ms. Gomez had pending obstruction charges at the time she gave this testimony. The Defendants did not disclose that at least six State witnesses had pending obstruction charges at the time of the trial.

66.     Mr. Ayala presented testimony from several witnesses who Cruz claimed was at the alleged gang meeting, all of whom confirmed that the claim was a lie and that no gang meeting occurred. In fact, one of these witnesses was in juvenile detention center and another was in the hospital on August 16, 1981 when this supposed gang meeting occurred.

67.     Mr. Palomo, who later pled guilty to one count of murder for the shooting at the park, has also sworn that he did not attend any supposed meeting at Mr. Ayala's house on the day of the shooting nor did he take any orders from Mr. Ayala.

68.     Other witnesses have also sworn that Wally Cruz admitted that he was intimidated by Defendants into lying to inculpate Mr. Ayala and his criminal co-defendant. In particular, Cruz's cousin and friend, Joseph Cruz, averred that Cruz repeatedly talked to him about being forced to falsely inculpate Mr. Ayala.

### Suppression of Evidence of Misconduct and Exculpatory Information

69.     Throughout the State's prosecution, Defendant Officers withheld material exculpatory and impeachment evidence from Mr. Ayala and his defense team, including the evidence of their own misconduct.

70.     Defendant Officers did not disclose, among other things, their fabrication of evidence to Mr. Ayala and Mr. Soto, his counsel, or the prosecuting attorneys in advance of or at the time of the criminal trial.

71.     Defendant Officers used false police reports to cover up their actions. They provided those false reports to prosecutors, and their fabricated evidence became the basis for charging and prosecuting Mr. Ayala.

72.     The Defendant Officers concealed their motive for framing Mr. Ayala and their steady harassment of him leading up to the false charges.

73.     Defendant Officers also gave false statements to trial prosecutors.

74.     Mr. Ayala's arrest and prosecution was based solely on the evidence fabricated by Defendants and thereafter suppressed by Defendant Officers.

75.     Absent Defendants' misconduct, Mr. Ayala would never have been arrested, prosecuted, or convicted.

**Mr. Ayala Is Wrongly Convicted and Sentenced to Life Imprisonment**

76.     On September 30, 1982, Mr. Ayala and Mr. Soto were convicted on all charges, largely on the fabricated testimony of Wally Cruz procured by the Defendants.

77.     Mr. Ayala was sentenced to life in prison.

78.     Mr. Ayala did nearly two decades of his prison sentence incarcerated in the draconian super-max prison Tamms Supermax. The conditions amounted to cruelty where he experienced solitary confinement, sensory deprivation, extremely aggressive security measures and long-term physical and social isolation. The Defendants were responsible for Mr. Ayala's placement at Tamms Supermax on account of falsely labeling him a gang leader.

79.     The foreseeable consequence of Defendants' actions was that Mr. Ayala would be wrongfully convicted of the shooting. Indeed, the very purpose of Defendants' actions was to frame Mr. Ayala, an innocent man, for a crime he did not commit.

80.     In addition, on information and belief, Defendant Officers suppressed and destroyed additional evidence still unknown to Mr. Ayala, which would have been exculpatory, impeaching, or shown his innocence.

**Mr. Ayala Is Exonerated**

81.     Mr. Ayala has always maintained his innocence and has pursued all legal avenues to prove it.

82.     On December 14, 2023, after years of post-conviction advocacy by Mr. Ayala, the Cook County State's Attorney's Office asked the court to vacate Mr. Ayala and Mr. Soto's convictions. All charges were subsequently dismissed.

83.     Mr. Ayala was released that day.

84.     Mr. Ayala and his cousin Mr. Soto each spent over 42 years in custody from the date of their arrests. At the time of their release, they had been wrongly incarcerated longer than any other Illinois exoneree.

**Chicago's Policy and Practice of Wrongly Convicting Innocent Persons in Violation of the Constitution**

85.     The City of Chicago and the Chicago Police Department are responsible, by virtue of their official policies, for inflicting miscarriages of justice on scores of criminal defendants like the one endured by the Plaintiff.

86.     Since the dearly 1980s, no fewer than 100 cases have to come to light in which Chicago police officers fabricated false evidence and/or suppressed exculpatory evidence in order to cause the convictions of innocent persons for serious crimes they did not commit.

87.     These cases include many in which Chicago police officers used the same tactics that Defendants employed against Plaintiff in this case, including but not limited to fabricating evidence, concealing exculpatory evidence, coercing statements through physical and psychological abuse, and manipulating witnesses in order to influence eyewitness identifications and false testimony - all to secure the arrest, prosecutions, and conviction of a person without probable cause and without regard for the person's actual guilt or innocence.

88.     At all relevant times, members of the Chicago Police Department, including the Defendants in this action, routinely fabricated and manipulated identification procedures to procure suspect identifications that they knew to be inaccurate.

89.     At all relevant times, members of the Chicago Police Department, including the Defendants in this action, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos, and other information. This concealed material was kept in files that were maintained only at the Chicago Police Department and never disclosed to the participants of the criminal justice system. As matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed or hidden at the close of the investigation rather than being preserved as part of the official file.

90.     Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including the named Defendants, concealed exculpatory evidence from Plaintiff.

91.     In the early 1980s, City of Chicago final policymakers were made aware that police officers were engaged in an unconstitutional pattern of suppressing investigative materials through two cases: *Palmer v. City of Chicago* and *Jones v. City of Chicago*. In April 1982, Chicago officials, including Chicago Police Department Superintendent Richard Brzeczek, became aware of the circumstances of a 1981 homicide investigation that resulted in charges being brought against George Jones, and the unconstitutional evidence suppression practice that caused his wrongful prosecution.

92.     In *Jones*, Detective Frank Laverty developed strong evidence that Jones could not have committed the murder. But, as stated by the Seventh Circuit, this evidence was placed "not in the police department's regular files but in its 'street files.' These were files that the police did not turn over to the state's attorney's office as they did with their regular investigative files." *Jones v. City of Chicago*, 856 F.2d 985, 995-96 (7th Cir. 1988).

93.     In the spring of 1982, Detective Laverty learned that Jones was on trial for the murder; he told his Commander that an innocent person was being prosecuted, but his Commander took no action; and Laverty then informed Jones's criminal defense attorney about the information in the undisclosed file. The court declared a mistrial, and the State's Attorney dropped all charges against Jones. Jones then filed a civil lawsuit stemming from the withholding of important investigative information in an undisclosed file, resulting in his wrongful prosecution. His case resulted in a jury verdict finding a custom of maintaining documents with important investigative material that were withheld from the State's Attorney's Office and criminal defendants.

94.     In 1988, in *Jones v. City of Chicago*, 856 F. 2d 985 (7th Cir. 1988), the Seventh Circuit affirmed the jury verdict in favor of George Jones, including the finding that the City of Chicago had maintained an unconstitutional practice of evidence suppression, permitting detectives to keep important investigative information undisclosed to criminal defendants.

95.     In April 1982, shortly after the Laverty revelations about the non-disclosure of important investigative materials, a class action lawsuit called *Palmer v. City of Chicago* was filed to challenge the use of informal files to suppress investigative materials, and, days later, the Honorable Judge McMillen issued a temporary restraining order requiring the CPD to preserve all investigative materials not included in formal police files. By September 1982, the action was transferred to the docket of the Honorable Milton Shadur, who thereafter granted a preliminary injunction on the matter.

96.     At this time, there was a citywide practice of using a "decentralized" file system for homicide investigations, whereby investigative steps were being documented in informal notes and internal to-from memoranda between investigators, all of which were treated as the

personal property of the investigators and were stored in parallel files not subject to disclosure. The information in the memos and notes was not making it into official reports. In addition, official reports often were not written right away, and instead were written only once they had settled on a suspect, at which point investigators might consider alternate suspects and other evidence to be non-pertinent. As a result, entire branches of an investigation, including investigation into alternate suspects, were not getting documented in official reports, and were instead sitting in memos and notes that were not disclosed and eventually destroyed once an investigation was complete.

97.     Indeed, these cases established that, at the time of Mr. Ayala's investigation in 1981 and resulting conviction in 1982, there was a policy and practice of suppressing exculpatory and/or impeaching material in clandestine files at all relevant times, including at the Area Four Detective Division during the investigation into the Pietrowski Park murders.

98.     Since 1981, at least 150 cases have come to light in which Chicago police officers fabricated false evidence or suppressed exculpatory evidence to cause the convictions of an innocent person for serious crimes they did not commit.

99.     The existence of this policy and practice of suppressing exculpatory and/or impeaching material in clandestine files continued into the 1990s (and until present day). In fact, federal juries have twice found that such a practice existed in the 1980s. *See Rivera v. Guevara*, No. 12 C 4428 (N.D. Ill.), *Fields v. City of Chicago*, No. 10 C 1168 (N.D. Ill.).

100.     In addition, the City routinely used illegal tactics, including torture, physical coercion, and psychological coercion, to extract involuntary and false confessions and statements from suspects and witnesses. There are well over 250 documented cases of Chicago police officers using torture and coercion to illegally obtain confessions in homicide cases. The City

had notice of this widespread practice of procuring false and coerced statements at the time of the events at issue in this case.

101.    In addition, the City routinely failed to investigate cases in which Chicago police detectives recommended charging an innocent person with a serious crime, and no Chicago police officer has ever been disciplined as a result of his misconduct in any of those cases.

102.    Before and during the period in which Mr. Ayala was falsely charged with and convicted of murder, the City also knowingly operated a dysfunctional disciplinary system for Chicago police officers accused of serious misconduct. The City almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. Further, the City's disciplinary apparatus had no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

103.    As a result, Chicago police detectives and their supervisors were able to engage in rampant misconduct with impunity, and as a result caused scores of wrongful convictions just in Area Four, where Defendant Officers were assigned, and hundreds more City-wide.

104.    Moreover, the City of Chicago and the Chicago Police Department routinely failed to investigate cases in which Chicago police detectives recommended charging an innocent person with a serious crime, and no Chicago police officer has ever been disciplined as a result of his misconduct in any of those cases.

105.    Prior to and during the period in which Plaintiff was falsely charged and convicted, the City of Chicago also operated a dysfunctional disciplinary system for Chicago police officers accused of serious misconduct. The City almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of

members of the public. Further, the disciplinary apparatus had no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

106.    As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence within the Chicago Police Department, which has been acknowledged by leaders of the Chicago Police Department and elected officials in Chicago. In accordance with the code of silence, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

107.    As a result of the City of Chicago's established practices, officers (including the Defendants here) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse circumstances. The practices that enable this belief include failing to track and identify police officers who are repeatedly accused of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct, and facilitating a code of silence within the Chicago Police Department. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens.

108.    The City of Chicago and its Police Department also failed in the years prior to the Plaintiff's wrongful conviction to provide adequate training to Chicago police detectives and other officers in many areas, including the following:

a.    The conduct of live lineup, photographic, and other identification procedures.

b.    The constitutional requirement to disclose exculpatory evidence, including how to identify such evidence and what steps to take when exculpatory evidence has been identified in order to ensure that the evidence is made part of the criminal

proceeding.

c.     The need to refrain from physical and psychological abuse, and manipulative and coercive conduct, in relation to suspects and witnesses.

d.     The use of anonymous or confidential informants.

e.     risks of wrongful conviction and the steps police officers should take to minimize risks.

f.     The risks of engaging in tunnel vision during investigation.

g.     The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

109.    The need for police officers to be trained in these areas was and remains obvious. The City's failure to train Chicago police officers as alleged in the preceding paragraph caused Plaintiff's wrongful conviction and his injuries.

110.    Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including the named Defendants, concealed exculpatory evidence from Plaintiff.

111.    The city's failure to train, supervise, and discipline its officers, including the Police Officer Defendants, condones, ratifies, and sanctions the kind of misconduct that the Defendants committed against Plaintiff in this case. Constitutional violations such as those that occurred in this case are encouraged and facilitated as a result of the City's practices and de facto policies, as alleged above.

112.    The City of Chicago and final policymaking officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

113.    The policies and practices described in the foregoing paragraphs were also approved by the City of Chicago policymakers, who were deliberately indifferent to the violations of constitutional rights described herein.

114.    The City also failed to appropriately supervise its officers. The United States Department of Justice ("DOJ") issued a report finding that there were "engrained deficiencies in the systems CPD uses to provide officers with supervision and training," and the deficiencies mirror those alleged here. In addition, the DOJ "confirmed that CPD's accountability systems are broadly ineffective at deterring or detecting misconduct, and at holding officers accountable when they violate the law or CPD policy."

115.    In particular, the DOJ found that the City failed to investigate nearly half of misconduct complaints. Where investigations did occur, there were "consistent patterns of egregious investigative deficiencies," and where misconduct complaints were sustained, discipline was inconsistent and unpredictable. 135. Since before Mr. Ayala's arrest and continuing for years afterward, municipal policymakers and department supervisors condoned and facilitated a code of silence within the CPD. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

116.    Numerous municipal policymakers have even admitted the code of silence exists.

The City practices that enable this belief include failing to track and identify police officers who are repeatedly accused of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct, and facilitating a code of silence within the CPD. As a result of these practices, members of the CPD act with impunity when they violate the constitutional and civil rights of citizens, knowing the City's lack of discipline and supervision and its code of silence will protect them.

117.    Defendant Officers engaged in the misconduct described herein because they had no reason to fear that the City would ever discipline them for doing so.

118.    Part and parcel with this history of fostering egregious misconduct, the CPD has a long history of using physically and psychologically coercive interrogation tactics in order to elicit statements from witnesses and suspects in criminal cases, which has caused false confessions and led to wrongful convictions.

119.    This history goes back at minimum to the 1980s and continued well into the 2000s and includes the conduct of infamous Chicago police detectives, including Jon Burge, Michael McDermott, Kenneth Boudreau, Kriston Kato, Reynaldo Guevara, and many others. For instance, Defendant Guevara has framed dozens of other innocent men and women over the span of two decades. Like Plaintiff, these men and women have lodged independent accusations of similar misconduct against Defendant Guevara.

120.    As of the filing of this complaint, at least 47 men and women have had their convictions thrown out because of Defendant Guevara's misconduct. They are Jacques Rivera, Juan Johnson, Jose Montanez, Armando Serrano, Jorge Pacheco, Roberto Almodovar, William Negron, Jose Maysonet, Angel Rodriguez, Santos Flores, Arturo DeLeon-Reyes, Gabriel

Solache, Ariel Gomez, Xavier Arcos, Ricardo Rodriguez, Robert Bouto, Thomas Sierra, Geraldo

Iglesias, Demetrius Johnson, David Gecht, Richard Kwil, Ruben Hernandez, Juan Hernandez,

Rosendo Hernandez, David Lugo, Carlos Andino, Daniel Rodriguez, Jaime Rios, Jose Cruz,

Marilyn Mulero, Nelson Gonzalez, Johnny Flores, Adolfo Rosario, Eruby Abrego, Jeremiah

Cain, Edwin Davila, Alfredo Gonzalez, Gamalier Rivera, Madeline Mendoza, John Martinez,

Thomas Kelly, Jose Tinajero, Louis Robinson, Fabian Santiago, Oscar Soto, Tony Gonzalez, and

Edwin Ortiz. Collectively, these men and women served hundreds of years in prison for crimes

they did not commit.

121.     Defendant Guevara has a long history of engaging in precisely the kind of

investigative misconduct that occurred in this case, including (a) manipulating witnesses, (b)

fabricating evidence, (c) suppressing exculpatory information, including fabricated information,

(d) coercing false confessions and false statements from suspects and witnesses using physical

and psychological violence, and (e) using other unlawful tactics to secure the arrest, prosecution,

and conviction of persons, without regard to their actual guilt. 143. In addition to the cases in

which individuals have been exonerated, there are dozens of other identified cases in which

Defendant Guevara engaged in serious investigative misconduct.

122.     Given this extensive history of misconduct and the City of Chicago's failure to

meaningfully supervise or discipline Guevara and others, it is apparent that Guevara engaged in

such misconduct because he had every reason to believe that the City of Chicago and its Police

Department condoned his behavior.

123.     Repeatedly, Defendant Guevara has invoked his Fifth Amendment right to not

answer questions about allegations against him because truthful responses could subject him to

criminal liability. The allegations Defendant Guevara has refused to respond to include

allegations that he has manipulated dozens of witnesses to provide false identifications, he has

fabricated false evidence, he has suppressed exculpatory evidence, including documentary

evidence, he has tortured and abused suspects and witnesses and has coerced false statements

from them.

124.    Defendant Guevara never received discipline from the City of Chicago or the

Chicago Police Department for any of the conduct set out above.

125.    In fact, the City of Chicago failed to supervise or discipline its police officers,

including Defendant Officers in this case. Defendant Officers engaged in the misconduct set

forth in this complaint because they knew that the City of Chicago and its Police Department

tolerated and condoned such conduct.

126.    In 2019, the Federal Bureau of Investigation ("FBI") and DOJ confirmed that

CPD supervisor Jon Burge was aware that on numerous occasions, detectives he was supervising

participated in the psychological and physical abuse of persons being questioned.

127.    Furthermore, CPD officers systematically suppressed exculpatory and impeaching

material by concealing evidence that a witness was coerced, manipulated, threatened, pressured,

or offered inducements to make false statements.

128.    The City's failure to train, supervise, and discipline its officers, including

Defendant Officers, condones, ratifies, and sanctions the kind of misconduct that Defendants

committed against Mr. Ayala in this case. Constitutional violations such as those that occurred in

this case are encouraged and facilitated as a result of the City's practices and de facto polices, as

alleged above.

129.    The City and final policymaking officials within the CPD failed to act to remedy

the patterns of abuse described in the preceding paragraphs despite actual knowledge of the

pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Ayala's ongoing injuries.

130.    The policies and practices described in the foregoing paragraphs were also approved by final policymakers for the City, who were deliberately indifferent to the violation of constitutional rights described herein.

### Mr. Ayala's Damages

131.    Mr. Ayala has suffered and continues to suffer enormous physical and psychological injury as a direct and proximate result of the Defendants' misconduct. Plaintiff served over 42 years in prison for crimes that he did not commit. He woke up each day with this reality, not knowing whether he would see his family again outside prison property or ever successfully prove the wrongfulness of his conviction and incarceration.

132.    Mr. Ayala served nearly two decades of his sentence in isolation at the Tamms Supermax facility. There - he suffered nothing short of torture. Numerous human rights organizations, politicians from both sides of the political spectrum, and eventually the governor demanded the closure of Tamms due to its human rights violations. Amnesty International conducted an investigation into Tamms and declared that Tamms Supermax was a "human rights catastrophe" and that it "flout[ed] international standards for humane treatment."

133.    Mr. Ayala suffered and continues to suffer permanent psychological and physical damages from his experience as a prisoner of torture at Tamms.

134.    To be clear, Mr. Ayala was not sent to Tamms because he posed a risk of harm to staff or other inmates. He was sent to Tamms because of his fabricated gang "status" and because of the Defendants labeling of him as a "gang leader." He was a wrongfully convicted,

political prisoner in so far as he punished for his "status" that was fabricated by Defendants from the start.

135.    Over the course of his 42 years' of imprisonment, Plaintiff was separated from his daughter and lost the chance to raise, care for, and mentor her.

136.    He was deprived of all opportunities for education. He was robbed every of every opportunity to pursue his interests and passions, build relationships, and all other basic human pleasures. He lived in constant anguish and pain, denied of even sunlight and fresh air for nearly half of his incarceration.

137.    As a result of Defendants' actions, Plaintiff continues to experience physical and psychological pain and suffering, humiliation, constant fear and anxiety, deep depression, despair, rage, and other physical and psychological effects from his years of wrongful conviction.

## COUNT I
### 42 U.S.C. § 1983 – Due Process:  Fabrication of Evidence

138.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

139.    As more fully described above, the individual Police Officer Defendants and Prosecutor Defendants acting individually, jointly, and in conspiracy, as well under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial, in violation of the Fourteenth Amendment by fabricating and soliciting false evidence in police reports, grand jury testimony, and trial testimony, including but not limited to fabricating testimony from Wally Cruz that falsely implicating Mr. Ayala in the Pietrowski murders.

140.    Defendants knew the evidence was fabricated because they fabricated it.

141.    The Police Officer Defendants and Prosecutor Defendants concealed and fabricated additional evidence that is not yet known to Plaintiff.

142.     Absent this egregious misconduct, Plaintiff would not have been wrongfully convicted of the Pietrowski murders. Thus, the defendants' misconduct deprived Plaintiff of his constitutional right to a fair trial and directly resulted in Plaintiff's wrongful conviction.

143.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

144.     As a direct and proximate result of this deprivation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

145.     The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

## COUNT II
### 42 U.S.C. § 1983 – *Brady* Violations

146.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

147.     As described in detail above, all of the individual Defendants acting individually, jointly, and in conspiracy, as well under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial, in violation of the Fifth and Fourteenth Amendments by withholding and suppressing exculpatory evidence from Plaintiff.

148.     All of the Defendants concealed exculpatory evidence, including but not limited to the following: (1) Cruz had been threatened and coerced to give fabricated testimony and then provided with benefits to keep him silent about the circumstances of his false and fabricated

30

testimony as described above; (2) Defendants threatened, physically abused, and falsely charged witnesses to gain their cooperation in giving false and fabricated testimony implicating Mr. Ayala; (3) Defendants concealed statements and reports showing definitively that no gang meeting occurred at Mr. Ayala's home; (4) Defendants concealed statements and reports of numerous witnesses who identified the true offenders of the shooting, including witnesses who identified Victor Rodriguez as one of the perpetrators; and (5) Defendants had charged other individuals with the Pietrowski murders and later dismissed the charges – to name a few examples.

149.    The Defendant officers hid police reports memorializing this exculpatory evidence in different files and purposefully ensured that the reports were not including in the investigative file or forwarded to prosecutors so that Plaintiff and his defense counsel would not discover the exculpatory evidence.

150.    The Defendants further suppressed their own misconduct and the misconduct of their fellow officers and prosecutors.

151.    The Defendants continued to suppress exculpatory evidence during Plaintiff's trial and after Plaintiff's conviction. Had this exculpatory evidence been disclosed, Plaintiff would not have spent 42 years in prison for a crime he did not commit.

152.    The misconduct described above was objectively unreasonable and was undertaken intentionally, with malice, willful indifference to Plaintiff's constitutional rights and in total disregard of the truth and Plaintiff's clear innocence.

153.    As a direct and proximate result of this deprivation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish,

humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

154.    The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

**COUNT III**
**42 U.S.C. § 1983 – Malicious Prosecution and Unlawful Detention**

155.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

156.    In manner more fully described above, all Defendants acting individually, jointly, and in conspiracy, as well under color of law and within the scope of their employment, deprived Plaintiff of his Fourth and Fourteenth Amendment constitutional rights.

157.    The Defendants accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so, in violation of his rights secured by the Fourth Amendment and the procedural and substantive due process components of the Fourteenth Amendment.

158.    In so doing, the Defendants caused Plaintiff to be unreasonably seized and improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury, and in all such proceedings were ultimately terminated in Plaintiff's favor indicative of his innocence.

159.    The Defendants subjected Plaintiff to unauthorized and arbitrary governmental action that shocks the conscience in that Plaintiff was deliberately and intentionally framed for a crime of which he was totally innocent, through the Defendants' fabrication of evidence, and suppression, and withholding of evidence.

160.     The misconduct described above was objectively unreasonable and was undertaken intentionally, with malice, willful indifference to Plaintiff's constitutional rights and in total disregard of the truth and Plaintiff's clear innocence.

161.     As a direct and proximate result of this deprivation of his constitutional right, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

162.     The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

**COUNT IV**
**42 U.S.C. § 1983 – Conspiracy to Violate Constitutional Rights**

163.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

164.     All of the individual Defendants, and other co-conspirators, known and not yet known to Plaintiff, reached an agreement amongst themselves to coerce, induce, and fabricate false evidence in the form of witness statements and testimony for the purpose of framing Plaintiff for a crime he did not commit.

165.     All of the individual Defendants, and other co-conspirators, known and not yet known to Plaintiff, reached an agreement amongst themselves to deprive Plaintiff of material exculpatory evidence and information to which he was lawfully entitled and to conceal their misconduct from Plaintiff, all in violation of Plaintiff's constitutional rights, as described above.

166.     In this manner, the Defendants acting in concert with other known and unknown co-conspirators, conspired to accomplish an unlawful purpose by an unlawful means.

167.    In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant joint activity.

168.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Plaintiff's constitutional rights.

169.    As a direct and proximate result of this of this illicit agreement referenced above, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

170.    The misconduct described above in this Count by the Defendant Officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

**COUNT V**
**42 U.S.C. § 1983 – Failure to Intervene**

171.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

172.    In the manner described above, one or more of the individual Defendants, and other unknown individuals, stood by without intervening to prevent the alleged constitutional violations, despite having an opportunity to do so.

173.    These Defendants had ample, reasonable opportunities as well as a duty to prevent this harm but failed to do so.

174.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with willful indifference to Plaintiff's constitutional rights, and in total disregard of the truth and Plaintiff's innocence.

175.    As a direct and proximate result of this failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered injuries, including, but not limited to, loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

176.    The misconduct described above in this Count by the Defendant Officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

**COUNT VI**
**42 U.S.C. § 1983 –** *Monell* **Policy and Practice Claim**

177.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

178.    The Chicago Police Department is responsible for scores of miscarriages of justice. Since the early 1980s, no fewer than 100 documented cases have come to light in which Chicago Police Detectives amassed "evidence" against an innocent person for a serious crime that he did not commit. There are undoubtedly many more such cases that have not yet been discovered.

179.    The false charges against innocent people include numerous cases in which Chicago Police Officers used the very same tactics that Defendants employed against Plaintiff in this case, including: (1) concealment of exculpatory evidence; (2) manipulation of witnesses in order to obtain false testimony; (3) manipulation of witnesses in order to influence their testimony; and (4) the use of other tactics to secure the arrest, prosecution and conviction of a person without regard to his actual guilt or innocence of the offense.

180.    At all times relevant hereto, members of the Chicago Police Department, including but not limited to the Defendants in this action, systematically suppressed exculpatory

and/or impeaching material by intentionally secreting discoverable reports, memos and other information in files that were maintained solely at the police department and were not disclosed to the participants of the criminal justice system. As a matter of widespread custom and practice, these clandestine files were withheld from criminal defendants, and they were routinely destroyed at the close of the investigation, rather than being maintained as part of the official file.

181.    Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including but not limited to the named Defendants, concealed exculpatory evidence from Plaintiff, including evidence that Defendants coerced, manipulated, and procured false testimony from Wally Cruz.

182.    At all times relevant hereto, members of the Chicago Police Department, including but not limited to the Defendants in this action, routinely threatened, coerced, manipulated, tricked, lied to, and misled witnesses for the purpose of influencing their testimony to conform to a false narrative contrived by the officers themselves. As a matter of widespread practice and custom, these tactics were also used to induce false identifications or false testimony against suspects.

183.    Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including but not limited to the named Defendants, threatened, coerced, bribed, manipulated, tricked, and improperly influenced the testimony of Wally Cruz and Isabel Gomez to falsely implicate Plaintiff.

184.    The City of Chicago and the Chicago Police Department has failed to investigate any of the cases in which Chicago Police Detectives recommended charging an innocent person with a serious crime, and no Chicago Police Officer has ever been disciplined as a result of his misconduct in any of those cases.

185.     Prior to and during 1981, the year in which Plaintiff was falsely charged with the Pietrowski murders, the City of Chicago operated a dysfunctional disciplinary system for Chicago Police Officers accused of serious misconduct. The Former Chicago Police Officer of Professional Standards almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. The Chicago Police disciplinary apparatus included no mechanism for identifying police officers who were repeatedly accused of engaging in the same type of misconduct.

186.     As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence with the Chicago Police Department. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

187.     As a result of the City of Chicago's established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct and facilitating a code of silence within the Chicago Police Department, officers (including the Defendants here) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens

188.     The defendant officers have a long history of engaging in the kind of investigative misconduct that occurred in this case, including manipulation/coercion of witnesses, fabrication of evidence, and concealment of evidence in the course of maliciously prosecuting innocent

persons. Defendants engaged in such misconduct because they had no reason to fear that the City of Chicago and its Police Department would ever discipline them for doing so.

189.    The City of Chicago and its Police Department failed in 1981 and in the years prior to provide adequate training to Chicago Police Detectives and other officers in any of the following areas, among others:

a.    The constitutional requirement to disclose exculpatory evidence, including how to identify such evidence and what steps to take when exculpatory evidence has been identified in order to ensure that the evidence is made part of the criminal proceeding.

b.    The need to refrain from manipulation or potentially coercive conduct in relation to witnesses.

c.    The need to refrain from using physical violence, threats of violence, and psychological coercion to procure involuntary statements from suspects.

d.    The risks of wrongful conviction and the steps police officers should take to minimize risks.

e.    The risks of engaging in tunnel vision during investigation.

f.    The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

190.    The need for police officers to be trained in these areas was and remains obvious. The City of Chicago's failure to train Chicago Police Officers as alleged in the preceding paragraph proximately caused Plaintiff's wrongful conviction and his injuries.

191.    The City's failure to train, supervise, and discipline its officers, including Defendants named herein, effectively condones, ratifies, and sanctions the kind of misconduct that the Police Officer Defendants committed against Plaintiff in this case. Constitutional violations such as occurred in this case are encouraged and facilitated as a result of the City's practices and *de facto* polices, as alleged above.

192.    The City of Chicago and officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

193.    The policies and practices described in the foregoing paragraphs were consciously approved by the City of Chicago policymakers who were deliberately indifferent to the violations of constitutional rights described herein.

194.    The actions of all of the individual Police Officer Defendants were done pursuant to policies and practices of the Chicago Police Department were done pursuant to one or more interrelated *de facto* policies, practices and/or customs of the Defendant City of Chicago which were ratified by policymakers for the City of Chicago with final policymaking authority. These policies and practices included, among others:

      a.    manufacturing and fabricating false witness statements and manipulating and lying to witnesses to influence unreliable and inaccurate testimony.

      b.    filing false reports and giving false statements and testimony about interrogations and witness interviews or constructing parts or all of witness statements; suppressing evidence concerning interrogations and/or

witness interviews; pursuing and obtaining wrongful prosecutions and
false imprisonments on the basis of fabricated witness statements,
including those by "jailhouse snitches;" and otherwise covering up the true
nature of those interviews and/or interrogations.

c.    failing to properly train, supervise, discipline, transfer, monitor, counsel
and/or otherwise control police officers, particularly those who are
repeatedly accused of misconduct, on how to avoid false arrests, wrongful
imprisonments, malicious prosecutions, and wrongful convictions, and on
the proper manner in which to conduct interrogations of witnesses and
arrestees. Among those the City failed to properly train, supervise,
discipline, transfer, monitor, counsel and/or otherwise control were the
repeat offenders Defendants Guevara and Halvorsen.

d.    perpetuating, encouraging and condoning the police code of silence,
specifically in cases where officers engaged in the violations articulated in
paragraphs a-d above, whereby police officers refused to report or
otherwise covered-up instances of police misconduct, and/or fabricated,
suppressed and destroyed evidence of which they were aware, despite
their obligation under the law and police regulations to report. This code
of silence caused police officers either to remain silent or give false and
misleading information during official investigations and Grand Jury
proceedings in order to protect themselves or fellow officers from
discipline, civil liability, or criminal charges. The code of silence also
caused police officers to perjure themselves in criminal cases where they

and their fellow officers have fabricated evidence or concealed

exculpatory evidence.

195.    The policies and practices described in this Count and in the factual allegations

section of this Complaint were maintained and implemented by the City of Chicago with

deliberate indifference to Plaintiff's constitutional rights.

196.    As a direct and proximate result of the City's actions, Plaintiff suffered injuries,

including, but not limited to, emotion distress, as if more fully alleged above.

197.    The City of Chicago is therefore liable for the misconduct committed by the

Police Officer Defendants.

## COUNT VII
### State Law Claim – Malicious Prosecution

198.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully

set forth herein.

199.    All of the individual Defendants caused Plaintiff to be improperly subjected to

judicial proceedings for which there was no probable cause. These judicial proceedings were

instituted and continued with malice and resulted in the injury to Plaintiff. All such proceedings

were ultimately terminated in Plaintiff's favor and in a manner indicative of innocence.

200.    The Defendants accused Plaintiff of the Pietrowksi murders, knowing that he was

innocent of the crime. All of the individual defendants fabricated evidence, manipulated witness

testimony, and withheld exculpatory evidence. The individual Defendant officers knowingly

made false statements to prosecutors with the intent of exerting influence to institute and

continue judicial proceedings against Plaintiff.

201.    The misconduct described in this Count was undertaken with malice, willfulness

and reckless indifference to Plaintiff's rights.

202.    As a direct and proximate result of this misconduct, Plaintiff suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

## COUNT VIII
## State Law Claim – Civil Conspiracy

203.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

204.    As described more fully in the preceding paragraphs, the individual Defendants acting in concert with one another and other co-conspirators, known and unknown, conspired to accomplish an unlawful purpose by unlawful means. In additional, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

205.    In furtherance of the conspiracy, the Defendants committed overt acts and were otherwise willing participants in joint activity.

206.    The violations of Illinois law described in this complaint, including Defendants' malicious prosecution of Plaintiff and their intentional infliction of emotion distress, were accomplished by Defendants' conspiracy.

207.    The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

208.    As a direct and proximate result of this misconduct, Plaintiff suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

## COUNT IX
## State Law Claim – Intentional Infliction of Emotional Distress

209.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

210.    The acts and conduct of the individual Defendants as set forth above were extreme and outrageous. The Defendants intended to cause or were in reckless disregard of the probability that their conduct would cause sever, emotional distress to Plaintiff.

211.    The individual Defendants' actions and conduct directly and proximately caused severe emotional distress to Plaintiff, and thereby constituted intentional infliction of emotional distress.

212.    The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to Plaintiff's rights.

213.    As a direct and proximate result of Defendants' wrongful acts, Plaintiff suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

## COUNT X
### State Law Claim - Willful and Wanton Conduct

214.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

215.    At all times relevant to this complaint the Defendants had a duty to refrain from willful and wanton conduct.

216.    Notwithstanding that duty, these Defendants acted willfully and wantonly through a course of conduct that showed an utter indifference to, or conscious disregard of, Plaintiff's rights.

217.    As a direct and proximate result of Defendants' wrongful acts, Plaintiff suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

## COUNT XI
## State Law Claim – *Respondeat Superior*

218.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

219.    When they committed the acts alleged in this Complaint, the individual Defendant officers were members and agents of the Chicago Police Department, an agency of the City of Chicago, acting at all relevant times within the scope of their employment and under color of law.

220.    Defendant City of Chicago is liable as principal for all torts committed by its agents.

## COUNT XII
## State Law Claim – Indemnification

221.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

222.    Illinois law provides that public entities must pay any tort judgment for compensatory damages for which its employees are liable based on upon the employees' misconduct committed within the scope of their employment activities.

223.    The individual Defendant officers are or were employees of the Chicago Police Department, an agency of the City of Chicago, who acted within the scope of their employment in committing the misconduct described herein.

224.    Defendant City of Chicago is responsible for paying any judgment entered against Defendant Officers. Mr. Ayala demands judgment against Defendant City of Chicago in amounts awarded to Mr. Ayala against Defendant Officers as damages, punitive damages, attorneys' fees, costs and interest.

225.    The Prosecutor Defendants are or were employees of the CCSAO, who acted within the scope of their employment in committing the misconduct described herein.

226.    Cook County is responsible for paying any judgment entered against Defendant Prosecutors. Mr. Ayala demands judgment against Defendant City of Chicago in amounts awarded to Mr. Ayala against Defendant Prosecutors as damages, punitive damages, attorneys' fees, costs and interest.

**WHEREFORE**, Plaintiff David Ayala prays this Court enter judgment in his favor and against Defendants WILLIAM C. FOSTER, STAR #3188, ERNEST M. HERNANDEZ, STAR #5388, JAMES H. SCHMIDT, STAR #895, B. MILLER, STAR #7854, E. LABIAK, STAR #2350, STEPHEN J. CASTO #15489, THOMAS J. RICHARDSON, STAR #3385, THOMAS PTAK, MICHAEL F. DUFFIN, RICHARD J. SOLITA, REYNALDO GUEVARA, R. JOHNSON, STAR #15536, DENNIS S. MADERAK, STAR #3251, W. ANDERSON, STAR #13003, IVORY L. HAMPTON, STAR #7021, ANTHONY J. PECORARO, STAR #2683, ANTHONY W. KUTA, STAR #4527, ROMAN S. TAPKOWSKI, STAR #15665, R. KUROWSKI, STAR #755, S. BYCZEK, STAR #9539, VINCENT J. TONDRYK, STAR #3492, KENNETH E. MANN, STAR #6725, P. WILINDEZ, STAR #8140, STRAZA, STAR 11807, MICHAEL L. MCMEEL, STAR #2198, EVANS, STAR #12864, NORBERT W. FERET, STAR #8550, EARL W. ZUELKE, STAR #4053, E. PICKETTE, STAR #12386, PHILLIP SZPICKI, STAR #4014, N. DUB, STAR #5243, SGT JOHN T. REGAN, STAR #1864. UNIDENTIFIED CHICAGO POLICE OFFICERS, the CITY OF CHICAGO, COOK COUNTY STATE'S ATTORNEYS GREGG OWEN, TIMOTHY MCMAHON, and JACK SMEETON, COOK COUNTY, ILLINOIS, and as-yet unknown employees of the City of Chicago and Cook County, awarding compensatory damages, costs and attorneys' fees against

all Defendants, and punitive damages against each of the individual Defendants in their individual capacities; and for such further and additional relief as this Court may deem appropriate and just.

## JURY DEMAND

Plaintiff demands trial by jury.

Respectfully Submitted,

**DAVID AYALA**

By: /s/JENNIFER BONJEAN

*One of His Attorneys*

Jennifer Bonjean
Bonjean Law Group, PLLC
750 Lexington Ave., 9th Fl.
New York, NY 10022
718-875-1850

**Chicago Address**
53 W. Jackson Blvd., Ste. 315
Chicago, Illinois 60604